## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF WISCONSIN

In re:

| | |
|---|---|
| **CRANBERRY GROWERS COOPERATIVE,** | Case No. 17-13318-cjf |
| **(d/b/a CranGrow)** | |
| Debtor. | Chapter 11 |

## <u>OMNIBUS DECLARATION OF WINSTON MAR</u>
## <u>IN SUPPORT OF FIRST DAY MOTIONS</u>

I, Winston Mar, declare:

1.      I am a Partner and Managing Director of SierraConstellation Partners ("**Sierra**"), an interim management and advisory firm and the financial consultant for Cranberry Growers Cooperative, a Wisconsin cooperative association ("**CranGrow**" or the "**Debtor**"), the debtor and debtor-in-possession in the above-captioned Chapter 11 bankruptcy case (the "**Chapter 11 Case**").  Subject to approval and authorization of the Bankruptcy Court, Sierra will be the Debtor's financial consultant during the Chapter 11 Case.  I will serve as the Debtor's Chief Restructuring Officer.

2.      I have personal knowledge of the facts set forth in this declaration (the "**Declaration**") and the business affairs, operations, books and records, and financial condition of the Debtor, and I am authorized to submit this Declaration on its behalf.  If called upon to testify, I would and could competently testify to the following.

3.      This Declaration is filed in support of the following motions (collectively, the "**First Day Motions**")[1] filed concurrently herewith for which the Debtor has requested a hearing on shortened notice to parties through a separate motion to the Court:

---

[1] Capitalized terms not separately defined herein have the meanings ascribed to them in the applicable First Day Motion.

i.  MOTION FOR INTERIM AND FINAL ORDERS (I) AUTHORIZING BUT NOT
DIRECTING PAYMENT OF PRE-PETITION WAGES, SALARIES, AND RELATED
OBLIGATIONS AND TAXES; AND (II) SCHEDULING A FINAL HEARING TO
CONSIDER ENTRY OF A FINAL ORDER (the "**Employee Wages Motion**");

ii.  DEBTOR'S MOTION FOR INTERIM AND FINAL ORDERS (1) PROHIBITING
DEBTOR'S UTILITY PROVIDERS FROM ALTERING, REFUSING, OR
DISCONTINUING SERVICE; AND (2) DEEMING DEBTOR'S UTILITY PROVIDERS
ADEQUATELY ASSURED OF FUTURE PAYMENT (the "**Utilities Motion**")

iii.  MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR
TO (A) MAINTAIN EXISTING INSURANCE POLICIES AND PAY ALL OBLIGATIONS
ARISING THEREFROM, AND (B) RENEW, REVISE, EXTEND, SUPPLEMENT,
CHANGE, OR ENTER INTO NEW INSURANCE POLICIES AND (II) GRANTING
CERTAIN RELATED RELIEF (the "**Insurance Motion**");

iv.  FIRST DAY MOTION FOR ENTRY OF INTERIM ORDER (I) AUTHORIZING POST-
PETITION DEBTOR-IN-POSSESSION FINANCING, AND AS PART OF THE MOTION,
GRANTING SUPER-PRIORITY CLAIMS TO THE DIP LENDER, (II) AUTHORIZING
INTERIM AND FINAL APPROVAL OF THE USE OF CASH COLLATERAL, (III)
GRANTING ADEQUATE PROTECTION TO THE PRE-PETITION SECURED LENDER,
AND (IV) SCHEDULING AN INTERIM HEARING ON AN EMERGENCY BASIS, AND
A FINAL HEARING ON THE MOTION (the "**CoBank DIP Motion**")

4.  The Debtor commenced this Chapter 11 Case on September 25, 2017 (the

"**Petition Date**").  The Debtor is operating its business as a debtor-in-possession pursuant to the

provisions of 11 U.S.C. §§ 1107 and 1108.

## I.   GENERAL BACKGROUND OF THE COMPANY

### A.   The Company

5.  Organized in January 2015, CranGrow is an unincorporated cooperative

association operating out of its facility in Warrens, Wisconsin. CranGrow's lifeblood is its patron

members (the "**Members**"), consisting of 31 cranberry growers as of the Petition Date.  The

Members oversee and manage operations at cranberry marshes of all sizes throughout the region,

most of which have been family-owned and operated for generations.  Some marshes have been

in operation for over 100 years.  As such, CranGrow's Members are cranberry experts that take

pride in producing superior cranberry crops of the highest quality.

6.  Each Member is a party with CranGrow to a Patron Membership Agreement that

delineates the obligations and rights, including rights to patronage refunds and other

disbursements, with respect to the cooperative.  CranGrow is unique in that its Members and

employees grow and process the fruit themselves.  Among other things, CranGrow's 100%

traceable, high quality products include sliced sweetened dried cranberries, whole sweetened

dried cranberries, concentrates of certain sugar contents and cranberry seed pomace.

7.      In August 2016, CranGrow completed a state-of-the-art cranberry processing

facility (the "**Warrens Facility**") which became fully operational in January 2017, to expand and

facilitate its production of a variety of cranberry products.  Since its inception, CranGrow has

developed into the second largest cranberry cooperative in the world.  It has established

relationships with a broad range of customers globally, including in North America, South

America, Europe, Asia and Australia.

### B.      The Debtor's Pre-Petition Secured Obligations

8.      The Debtor's pre-petition secured obligations consist of (a) all pre-petition

obligations of Debtor to CoBank (including without limitation all principal, interest, default

interest, fees, costs and expenses) under the Credit Agreement dated as of February 11, 2016 (as

amended by the Amendment to Credit Agreement dated as of February 15, 2017, the

Amendment to Credit Agreement dated as of June 2, 2017, and the Forbearance Agreement and

Third Amendment to Credit Agreement dated as of August 17, 2017, and as further amended,

restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**"), the

Amended and Restated Monitored Revolving Credit Promissory Note numbered 00100914S01-E

dated as of September 22, 2017 (as amended, restated, supplemented or otherwise modified from

time to time, the "**Revolving Note**"), and the Amended and Restated Multiple Advance Term

Promissory Note numbered 00100914T01-A dated as of February 15, 2017 (as amended,

restated, supplemented or otherwise modified from time to time, the "**Term Note**," and together

with the Revolving Note, collectively, the "**Promissory Notes**"), and a Security Agreement

dated February 11, 2016 ("**Security Agreement**");  the Credit Agreement, the Security

Agreement and the Promissory Notes, together with any and all related loan and security

documents and all other instruments, agreements and other documents delivered in connection

therewith, are referred to collectively as the "**Loan Documents**"); and (b) all other indebtedness, liabilities and obligations of the Debtor to CoBank. As of the Petition Date, CranGrow owed CoBank approximately $8,100,000 under the Revolving Note and $13,740,00 under the Term Note. These obligations are secured by the Debtor's assets.

### C.    Events Precipitating the Bankruptcy Filing

9.      Since beginning the construction of the Warrens Facility, CranGrow encountered financial hardship due to a confluence of factors.  First, the construction costs of the Warrens Facility were $5.7 million above budget.

10.     Second, the cranberry industry has experienced an oversupply of cranberries in addition to an excess in processing capacity.  This resulted in driving down prices from CranGrow's initial forecast model for the Warrens Facility, representing a reduction of approximately $8.6 million of expected value annually.

11.     Third, CranGrow has been operating at a suboptimal level due to its underutilization of the Warrens Facility.  Liquidity constraints caused by both higher capital needs than projected and limited sales forced CranGrow to operate at lower production levels, leading to limited overhead absorption (i.e., higher production costs per pound of product).

12.     In addition, various unanticipated events further contributed to CranGrow's difficulties.  For example, on August 8, 2017, CranGrow received a citation from the Occupational Safety and Health Administration for various violations.  While CranGrow corrected these violations, they ultimately resulted in an $85,000 fine.  Also, on July 26, 2017, one of CranGrow's former Members, Gary Jensen, filed a lawsuit against CranGrow in the State of Wisconsin Circuit Court, Monroe County, styled *Gary Jensen et al vs. Cranberry Growers Cooperative,* Case No. 2017CV000159 (the "**Jensen Action**") alleging breach of contract claims and seeking approximately $1.5 million in damages.  CranGrow has vigorously disputed the validity of the claims made in the Jensen Action.

13.     Combined, the foregoing factors threatened CranGrow's financial stability and ongoing operations.  CranGrow became unable to service its obligations under the Credit

Agreement.  CoBank sent a letter to CranGrow declaring certain provisions of the Credit

Agreement to be in default and reserving its rights to exercise rights and remedies.

14.     CranGrow engaged with CoBank in a discussion of its financial position and to

collaborate on a potential restructuring of its debt obligations.  In connection with those

discussions, on August 17, 2017, CoBank and CranGrow entered into that certain *Forbearance

Agreement And Third Amendment To Credit Agreement* pursuant to which CoBank agreed to

forbear exercising its remedies under the Loan Agreement on account of anticipated and existing

defaults through September 30, 2017, and provided CranGrow additional liquidity to fund

operations.

15.     In need of capital to fund ongoing business initiatives and needing to deleverage

its balance sheet, CranGrow engaged Sierra to assist in restructuring the cooperative.  Among

other things, Sierra assisted CranGrow in engaging and negotiating with Graceland to provide

marketing and sales services for CranGrow's products, culminating in that certain Services

Agreement effective as of August 10, 2017 (the "**Graceland Services Agreement**") between

CranGrow and Graceland, as discussed below.

16.     With the guidance of Sierra, CranGrow explored a number of options to

restructure its operations; however, the numerous factors impeding the company's growth proved

to be delimiting.  With the expiration of the forbearance agreement with CoBank on the horizon

and after considering a wide range of alternatives, CranGrow and its board made the decision

that commencing the Chapter 11 Case would provide the best means to meet its long-term

financial stability needs, support its operations, and fulfill its commitment to suppliers and

customers going forward.

## II.    THE DEBTOR'S BUSINESS PLAN IN BANKRUPTCY

17.    During this Chapter 11 Case, the Debtor intends to recapitalize and reorganize, confirm a Chapter 11 plan and then expediently emerge from bankruptcy, by executing certain objectives as described below.

### Partnership With Graceland

18.    CranGrow's partnership with Graceland has provided and will continue to provide substantial value to CranGrow and will serve as a basis for its successful reorganization.

19.    The Graceland Services Agreement has provided CranGrow access to Graceland's experienced sales force and market presence.  Under the agreement, Graceland agreed to, among other things, acquire certain of CranGrow's production of dried cranberry for marketing and resale while providing a minimum average price.  Graceland also has sold CranGrow's existing finished product on CranGrow's behalf with minimal commission.

20.    CranGrow's sales have already shown significant improvement due to the Graceland Agreement.  As of the Petition Date, Graceland had generated approximately $2.0 million of firm orders.  Graceland expects to increase this figure to $3.0 million in firm orders by the end of September.

21.    Graceland and CranGrow also are in negotiations for a *Lease and Support Agreement* (the "**Graceland Lease and Support Agreement**"), pursuant to which Graceland will enter into a 10-year lease (with options for certain extensions) of the processing plant, and a 10-year lease (with option to purchase) of the equipment and machinery used in CranGrow's dried sliced and whole fruit, juice and juice concentrate business.  Graceland and CranGrow will also enter into a supply agreement (the "**Graceland Supply Agreement**) under which (a) CranGrow will be the exclusive supplier of cranberries to Graceland at the Warrens Facility with a base price pursuant to a sliding scale and shared upside, and (b) Graceland will make a prepayment that CranGrow will apply to initial payments to growers for their 2017 crop.  The terms of the anticipated Graceland Lease and Support Agreement are set forth on **Exhibit "A"** hereto and incorporated by reference.

22.     During the Chapter 11 Case, CranGrow intends to foster and exploit its partnership with Graceland.  This will play a significant role in the reorganization.  Accordingly, CranGrow intends to assume the Graceland Services Agreement and the Restructuring Support Agreement, and intends to complete and execute the Graceland Lease and Support Agreement and the Graceland Supply Agreement subject to the Court's authorization and approval thereof.

**Freezer Agreement**

23.     CranGrow and Warrens Cold Storage LLC ("**WCS**"), a company of which Mr. Jensen is the president and the owner, are parties to that certain Freezer Storage Agreement effective as of October 1, 2016 (the "**Freezer Agreement**"), pursuant to which CranGrow  pays a fee for freezer storage of cranberries of its Members, for a 30 year, 3 month term.

24.     CranGrow also is the landlord of both WCS and Castle Rock Cranberry Bogs, LLC, under that certain Real Estate Lease (the "**Lincoln Lease**") effective January 20, 2016, pursuant to which CranGrow leases certain real property on which the freezer, which is the subject of the Freezer Agreement, is situated.  The Lincoln Lease provides for, among other things, the option for CranGrow to purchase the freezer after the conclusion of five years of the Lincoln Lease.

25.     Certain allegations in the Jensen Action are based on CranGrow's alleged breach of the Freezer Agreement.  WCS has itself breached the Freezer Agreement by, among other things, refusing to permit CranGrow and its Members to use the freezer, which is unequivocally critical to preserve their cranberries. As detailed below, the Debtor intends to assume the Freezer Agreement and the Lincoln Lease, and to compel WCS to comply with the terms of the Freezer Agreement.

**Member Interests In Reorganized CranGrow**

26.     Participating Patron Members have agreed to contribute value to the Debtor's reorganization to benefit the bankruptcy estate, by foregoing a substantial percentage of their rights to due and outstanding payment under their respective *Patron Membership Agreements* and agreeing to supply their cranberry stock at less than fair market value in accordance with the

Graceland Supply Agreement.  In exchange for their contributions, Participating Patron Members will be offered new member interests in the reorganized Debtor after confirmation of the Chapter 11 plan.  Because all presently existing member interests will be cancelled, the membership structure of the reorganized Debtor will be restructured post-confirmation.

### III.    FACTS IN SUPPORT OF FIRST DAY MOTIONS

27.    Contemporaneously with the filing of its Chapter 11 petition, the Debtor has filed the First Day Motions. The Debtor requests that the Court grant each of the First Day Motions described below as they constitute a critical element in ensuring that the Debtor's operations are not disrupted and the Debtor can successfully reorganize.

### A.    The Employee Wages Motion

28.    The Debtor pays its employees on a bi-weekly basis.

29.    The Debtor last paid its Employees on September 22, 2017 for services rendered by those employees through September 16, 2017.  The next payroll after the Petition Date is October 6, 2017, which will be services rendered by Employees from September 17, 2017 through September 30, 2017.  Accordingly, there are eight days of pre-petition wages included in the October 6, 2017 Payroll.

30.    The Debtor uses ADP to process its payroll, calculate paychecks, administer all payroll deductions and tax withholdings, and file related tax returns.  ADP withdraws Employees' net pay amounts from the Debtor's account in a lump sum and issues checks and direct deposits drawn on ADP's own accounts to Employees.

31.    The continued, uninterrupted service of the Employees is essential to the Debtor's reorganization efforts.  The Debtor recognizes that any delay in paying outstanding wages, salaries, and other compensation due to the Employees as of the Petition Date, or failure by the Debtor to continue its practices, programs, and policies with respect to Employee benefits could severely disrupt the Debtor's relationship with its Employees, impair morale at this critical juncture, and disrupt the Debtor's business operations.

32.     Some of the wages of Employees are based on hours scheduled which vary in any given pay period.  Accordingly, the amount listed below have been conservatively calculated, and the payments made may actually be less than noted.

33.     As of the Petition Date, the gross amount of the Pre-Petition Payroll will not exceed $52,000,which includes: (a) net payroll amounts to be paid directly to the Debtor's Employees totaling approximately $32,000 (including regular compensation, overtime, and other compensation earned); (b) amounts to be deducted and paid on behalf of Employees, including state and federal payroll taxes, unemployment, Medicare and Social Security deductions in the approximate amount of $12,000; (c) employer taxes in the approximate amount of $4,600; (d) deductions for individual contributions to medical, dental, and vision insurance in the approximate amount of $1,350; and (e) deductions for individual garnishments in the approximate amount of $850.

34.     ADP calculates all payroll taxes due for a given pay period and debits that amount from Debtor's operating account in a lump sum prior to each pay date.  ADP in turn remits the Payroll Taxes to the appropriate taxing authorities and files the related periodic information returns when due.

35.     The Debtor believes that none of the Employees will receive payments in excess of $12,850.

36.     In the ordinary course of their duties on behalf of the Debtor, various Employees may from time to time incur certain ordinary business expenses on behalf of the Debtor for which they are customarily reimbursed by the Debtor, or such expenses may be charged directly to the Debtor but the employee may be obligated on the expense if it is not paid by the Debtor. Although the Debtor requests that Employees submit reimbursement requests promptly, not all Employees do so.  Consequently, it is difficult for the Debtor to estimate the amount of these Reimbursement Obligations outstanding as of the Petition Date.

37.     In the ordinary course of its business, the Debtor makes the following Health and Welfare Benefits programs available to its Employees:

9

| Benefit | Provider |
|---|---|
| Health Insurance | Unity Health Insurance |
| Dental /Vision Insurance | Ameritas Life Insurance Corp. |

38.     Employees are eligible to participate in the Health and Welfare Benefits programs after roughly 30 days of employment with the Debtor.  The Employees receiving the Health and Welfare Benefits are required to pay certain amounts toward those benefits as a pre-tax payroll deduction. The Debtor's annual cost of providing the Health and Welfare Benefits is approximately $130,000.

39.     As of the Petition Date, the Debtor estimates that its pre-petition obligations on account of the Health and Welfare Benefits accrued and unpaid will not exceed $20,000, a portion of which are employee contributions.  However, there may be additional amounts related to the pre-petition period that will come due post-petition.

40.     The Debtor maintains an employee benefit policy pursuant to which Employees are provided with certain PTO, which encompasses vacation days, sick time, personal days and holiday leave. The amount of PTO provided generally depends on each Employee's length of service with the Debtor and full-time or part-time status.

41.     Certain of the Debtor's Employees may have accrued and unused PTO as of the Petition Date, and this benefit, not inclusive of applicable taxes, is in the approximate of $43,000.

42.     Under applicable state law, the Debtor is required to maintain workers' compensation insurance policies and programs to provide Employees with workers' compensation coverage for injury claims arising from or related to their employment with the Debtor.

43.     Payment of the Employee Obligations at this time would serve to enhance the value of the Debtor's estate for the benefit of all interested parties.

44.     The majority of the Debtor's Employees rely exclusively on their compensation, benefits, and reimbursement of expenses to satisfy their daily living expenses. Consequently, these Employees will be exposed to significant financial difficulties if the Debtor is not permitted to honor obligations for unpaid compensation, benefits, and reimbursable expenses. Moreover, if the Debtor is unable to satisfy the Employee Obligations, morale and loyalty will be jeopardized at a time when the continued support of Employees is critical. It is essential to the Debtor's ability to reorganize that it be able to preserve morale and continue operating its business. Employees are critical to the Debtor's reorganization efforts.  Should the Employee Obligations remain unpaid, workers will likely be unwilling to continue working for the Debtor, thereby significantly reducing the Debtor's chances of a successful reorganization

45.     In the absence of the relief requested in the Employee Wages Motion, the Debtor believes that its Employees may seek alternative employment opportunities, perhaps with the Debtor's competitors. Such a development would deplete the Debtor's workforce, hinder the Debtor's ability to operate, and likely diminish creditors' confidence in the Debtor. Moreover, the loss of valuable workers and the recruiting efforts that would be required to replace them would be a massive and costly distraction at a time when the Debtor should be focusing on stabilizing its operations.

46.     The Debtor has sufficient funds to pay the amounts described herein in the ordinary course of business by virtue of expected cash flows from ongoing business operations, and anticipated post-petition financing and access to cash collateral.  Also, under the Debtor's existing cash management system, the Debtor can readily identify checks, wire transfers, drafts, ACH debits, and other transfers drawn on the Debtor's bank accounts as relating to an authorized payment in respect of the Employee Obligations. Accordingly, the Debtor believes that pre-petition payments not authorized by the Court will not be honored inadvertently.

11

### B.      The Utilities Motion

47.      In the ordinary course of business, the Debtor regularly obtains utility services from the Utility Providers for, at least, water, sewer, gas, electrical, refuse collection, telephone, and internet.

48.      At all relevant times, the Debtor has attempted to remain current on required payments to the Utility Providers.  As of the Petition Date, to the best of the Debtor's knowledge, with the exception of trash and telephone, the Debtor is current on all amounts owing to the Utility Providers other than any payment interruption that may be caused by the initiation of this Chapter 11 Case.  The past due bills on trash and telephone total less than $1,200.00.

49.      Uninterrupted utility services are essential to the Debtor's ongoing business operations and, therefore, to the success of its reorganization.  Any interruption of utility services, even for a brief period of time, would negatively affect the Debtor's business operations, relationship with its growers and suppliers, relationship with Graceland, revenues and, ultimately, value and creditor recoveries.  Moreover, interruption in utility services would jeopardize the Debtor's continued operations and directly (and adversely) impact the Debtor's member growers and its relationship with Graceland.  It is critical that utility services continue uninterrupted during this Chapter 11 Case.

50.      The Debtor intends to pay post-petition obligations owed to the Utility Providers in a timely manner.  The Debtor's average monthly payments to the Utility Providers since January 2017 are set forth on Exhibit A to the Utilities Motion.  The Debtor expects that cash flow from operations and the proposed DIP financing will be sufficient to pay post-petition utility obligations.

51.      Nevertheless, to provide assurance of payment for future services to the Utility Providers, the Debtor will deposit the Adequate Assurance Deposits, in an amount equal to the average monthly payment to each Utility Provider as set forth on Exhibit A to the Utilities Motion.

12

52.     The Adequate Assurance Deposits were calculated based on a review of the Debtor's books and records, and the Debtor maintains that the Adequate Assurance Deposits represent the most accurate obtainable averages of the Debtor's utility payments.

53.      The Debtor submits that the Adequate Assurance Deposits, in conjunction with the Debtor's ability to pay for future utility services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Providers.  The Debtor anticipates mailing the Adequate Assurance Deposits to the Utility Providers upon the Court entering an order granting this Motion.

54.     The Debtor expects that revenue from continued operations and DIP financing will be sufficient to pay the Debtor's utility costs as they come due.  Accordingly, the Debtor submits that the Adequate Assurance Deposits provide more than adequate assurance of payment to the Utility Providers.

### C.     The Insurance Motion

55.     In connection with the operation of its business and management of their properties, the Debtor maintains various insurance policies (the "**Insurance Policies**") through several different insurance carriers (the "**Insurance Carriers**").  The Insurance Policies, as set forth below, include, among others, coverage for workers' compensation, certain commercial liability, and health insurance.

56.     Continuation of the Insurance Policies is essential to the preservation of the value of the Debtor's business, properties, and assets.  Moreover, in many cases, the coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtor's business activities.

57.     The Debtor maintains various insurance policies (the "**Liability Insurance Policies**"), including workers' compensation, certain commercial liability, and automobile liability.  The Liability Insurance Policies are arranged generally through the Debtor's insurance broker, the Horton Group (the "**Broker**").  The Broker provides support and other services to the

13

Debtor.  For the Liability Insurance Policies, the premiums are paid to the Broker who then

remits the premiums to the Insurance Carriers.

58.     The Liability Insurance Policies are essential to the ongoing operation of the

Debtor's business.  Under Wisconsin law, the Debtor is required to maintain workers'

compensation and to provide its employees with workers' compensation coverage for claims

arising from or related to their employment with the Debtor.  As of the Petition Date, the Debtor

estimates that approximately $11,772.27 in pre-petition obligations on account of the Liability

Insurance Policies remains accrued and unpaid.  However, there may be additional amounts pre-

petition amounts that will come due post-petition.  The Debtor requests authority to pay any and

all amounts due and owing with respect to the Liability Insurance Policies.  Payment of the

Liability Insurance Policies is essential to the ongoing operation of the Debtor's business.

59.     The Debtor also maintains health and welfare insurance policies for its employees

(the "**Health and Welfare Insurance Policies**").  With respect to the Health and Welfare

Insurance Policies, the premiums are paid directly to the Insurance Carriers.

60.     As of the Petition Date, certain premiums and other amounts due under the Health

and Welfare Insurance Policies, aggregating approximately $17,123.21 were unpaid.  To the

extent a premium relating to a period prior to the Petition Date is outstanding with respect to any

Insurance Policy, the Debtor seeks authority to make such payment in the same manner that such

payments were made prior to the Petition Date.

61.     The Debtor must continue its Insurance Policies, which provide a comprehensive

range of coverage for the Debtor and its business and properties, in full force and effect.  If these

policies were allowed to lapse, the Debtor would be exposed to substantial liability for any

damage or loss resulting to persons and property of the Debtor and others.  Maintenance of the

Insurance Policies is necessary to the retention of the Debtor's employees and is critical to the

success of the Debtor's business and reorganization.

62.      The Insurance Policies are essential to preserve the value of the Debtor's business, properties, and assets.  Some of the Insurance Policies required by the various regulations, laws, and contracts that govern the Debtor's commercial activities.

63.      It is essential to the continued operation of the Debtor's business and its efforts to reorganize that all Insurance Policies are paid on a timely basis.  The risk of cancellation of the Insurance Policies will have a devastating effect on the financial well-being and morale of the Debtor's employees and their willingness to remain in the Debtor's employ.  Departures by employees at this critical time may result in a severe disruption of the Debtor's business.

64.      The Debtor estimates that the total amount proposed to be paid with respect to pre-petition amounts owed under the Insurance Policies, will not exceed $30,000.

65.      Failure to pay amounts related to the Insurance Policies as they come due may harm the Debtor's estate in several ways.  Specifically, there is the potential for insurance coverage to be terminated.  Such termination would likely place additional strain on the Debtor's relationships with employees who benefit from the Debtor's insurance coverage, and would also eviscerate the Debtor's ability to prevent loss in value caused by casualty, natural disaster, or another unforeseen event.  The continuation of the Debtor's Insurance Policies is critical.  In the event of termination of insurance coverage, the Debtor would need to obtain replacement insurance, likely at a higher price.  Cancellation of the Insurance Policies would threaten to halt the Debtor's operations altogether.  In light of the importance of maintaining insurance coverage with respect to its business activities, and to ensure that appropriate insurance coverage is maintained during this Chapter 11 Case and that the Debtor is fulfilling its fiduciary duties, the Debtor submits it is in the its sound business judgment to maintain the Insurance Policies and to pay related amounts as described in the Insurance Motion.  Under the relief contemplated by the Insurance Motion, maintenance, continuance and payment of the Insurance Policies would support ongoing business operations.

15

### D.     The CoBank DIP Motion

66.     As part of the Debtor's Chapter 11 business plan, the Debtor and CoBank have entered into a term sheet outlining the material terms and conditions of the DIP Facility which are set forth in the Summary incorporated in the CoBank DIP Motion.  The Debtor will issue a promissory note in favor of CoBank in the amount of $13.25 million, rolling up the approximate amount of $8.25 million in the Revolving Note and providing an additional amount of $5 million in post-petition credit (the "**Amended Revolving Note**") and will execute the Fourth Amendment to the Credit Agreement which will amend and restate the provisions of the Credit Agreement.

67.     The terms set forth in the Summary are a result of extensive negotiations between the Debtor and CoBank.  The Debtor initially requested financing in the form of a DIP loan secured by all of the Debtor's assets and use of cash collateral with adequate protection provisions such as the granting of replacement liens to the extent of the diminution in value of the Bank's pre-petition collateral.  CoBank was unwilling to agree to such an arrangement and is requiring as a condition to the DIP Facility that it be permitted to gradually "roll-up" the amounts due under the Revolving Note in the DIP Facility.  Under this arrangement, CoBank maintains its pre-and post-petition collateral which allows the Debtor to borrow more funds to pay the operations, fees and costs of the Chapter 11 Case.  Since the Debtor's post-petition expenses would exceed the amount of any traditional DIP loan CoBank would be willing to make, there is a substantial benefit to the estate under this roll-up financing.  Further, CoBank has agreed to a carve-out of its collateral to allow a prepayment by Graceland to the Debtor for 2017 inventory.  This is extremely significant to the Debtor since the proceeds of the prepayment will be used to pay its growers whom have not been paid any significant amount for their 2016 crop.

68.     After careful consideration by its Board at a meeting held on Saturday, September 23, 2017, following a discussion of alternatives, the Debtor and its Board believe that the proposed DIP Facility is a reasonable roll-up structure which gives a meaningful infusion of new capital rather than merely enhancing the lender's collateral position.  The Debtor notes that

16

structure allows for a roll-up of the Pre-Petition Indebtedness gradually rather than the lender having all of its pre-petition debt paid at once and that CoBank has made a significant concession in allowing a carve-out of its collateral for payment to the growers.

69.      The Debtor has no other reasonable alternatives for DIP financing in this case.  If the Debtor cannot obtain DIP financing any other way, it would be forced to liquidate.

70.      The Debtor submits that the post-petition financing contemplated herein and through the DIP Loan is fair, reasonable, reflects the exercise of the Debtor's sound business judgment, and is in good faith.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Declaration was executed on September 26, 2017.

_____
Winston Mar
Chief Restructuring Officer
Cranberry Growers Cooperative

# Exhibit "A"

## NON-BINDING TERM SHEET

| | |
|---|---|
| **General:** | This term sheet is dated _____, 2017 and sets forth the proposed economic terms for the transaction (the "Transaction") between Graceland Fruit, Inc. ("Graceland") and Cranberry Growers Cooperative (the "Cooperative") (collectively, the "Parties"). |
| **Property Lease Structures:** | Graceland will enter into a ten (10) year facility lease with respect to the processing plant, fixtures and appurtenances thereto (the "Facility") situated on the real property owned by the Cooperative in Warrens, Wisconsin  used in the Cooperative's dried sliced and whole fruit, and juice and juice concentrate business (the "Land"), with two additional five (5) year extension options.  The Parties will also enter into an easement agreement, whereby Graceland will be granted an easement for ingress and egress over the Land to access and use the Facility.  In connection with the Facility lease, and as a condition thereof, Graceland will also enter into a ten (10) year equipment lease with respect to all tangible personal property located in the Facility, including all machinery, equipment, attachments, additions, accessories, replacement parts, substitutions and repairs incorporated into the Facility (the "Equipment").  The Facility lease will be a triple net lease, where in addition to base rent for the Facility Graceland is responsible to make additional rent payments in an amount equal to actual costs incurred by the Cooperative during the Facility lease term for all property taxes,  insurance, and other similar expenses with regard to the Land  and improvements thereon, prorated based on the portion thereof attributable to the Facility, as well as all utility costs, operating costs, repairs, and maintenance with respect to the Facility, with the exception of capital expenditures and improvements to the Facility (such as any structural portion of the Facility, including roofs, ceilings, floors, walls, and building mechanical systems) unless required by Graceland for its specific operations (and not generally needed for occupancy).  With respect to the Equipment lease, the Cooperative will not be responsible for equipment replacements or repairs and maintenance.  The Parties agree and understand that the Facility lease will be expressly conditioned upon (1) the Parties fulfilling on or before the effective date of the Facility lease customary closing conditions including certification as to the continuing accuracy of representations and warranties in the Facility lease including creditworthiness and processing and sales of finished goods capabilities of Graceland and (2) entering into and performing the other agreements and covenants |

contemplated by this term sheet or to effect the economic terms of the Transaction, including specifically without limitation the Equipment lease, the Supply Agreement, the purchase of raw materials inventory, the purchase of finished goods inventory, the Services agreement, and the agreement to use excess capacity at the Facility to toll process aronia provided by the Cooperative and its member growers.

**Rental Economics:**    Graceland will provide monthly rental payments under the Facility lease and the Equipment lease in an amount to be determined based upon an appraisal completed by the Cooperative in respect to the Land and all improvements, buildings (including the Facility), equipment and machinery (including the Equipment), fixtures and appurtenances thereto (collectively, the "Property") (assumed to be in line with the appraisal related to the existing term loan secured by the Property, in an amount equal to approximately $14,000,000). The monthly rental payments will be based upon a ten (10) year amortization schedule of the asset values comprising the Facility and the Equipment, at an interest rate to be determined (assumed to be at or around 6.0%), and the Parties agree and understand that the asset value of the Facility is expected to be no more than 10-15% of the total asset values of the Property. Total monthly rental payments are estimated to be not greater than $160,000 per month or approximately 90% of the ten (10) year amortization schedule of the asset values comprising the Property. It is agreed and understood by the Parties that the Facility lease between the Parties will be a true lease, with no agreement for the sale of the Facility at the end of the lease term, and the Equipment lease will be a financing lease, with a buy-out option at the end of the lease term. In the event of the bankruptcy or insolvency of the Cooperative during the initial ten-year lease terms, Graceland shall have the option during the remaining initial ten-year lease terms, exercisable upon One Hundred Twenty (120) days' written notice to the Cooperative, to acquire One Hundred Percent (100%) of the equity interests in the Cooperative at a purchase price of 100% of the net FMV of the Cooperative, provided Graceland understands that any such purchase may cause the Cooperative to be an ineligible borrower under its existing debt financing secured by the Property, resulting in an acceleration of the due date of such indebtedness. This option to purchase shall be assignable by Graceland to another cranberry grower cooperative formed for such purpose.

**Cranberry Economics:**    Graceland shall pay the Cooperative for cranberries supplied to Graceland under the Supply Agreement per the sliding

scale, plus the sum of $10.00 per barrel of cranberries, which are of acceptable quality and variety, an agreed upon administrative charge per barrel of cranberries which are of acceptable quality and variety, estimated to be $0.50 per barrel, and a storage charge per barrel of cranberries which are of acceptable quality and variety, which charge shall begin to accrue thirty days following placement of the cranberries into the freezer, as pulled for processing on a net 30 basis (net 30 on all payments other than sliding scale payments), which payments the Cooperative will distribute at its discretion as follows: sliding scale will be paid to the Cooperative's growers, $7.50 per barrel retained to fund expenses associated with the cleaning, binning, and freezing raw cranberries at harvest, and $2.50 per barrel, the estimated $0.50 per barrel, and the storage charge per barrel for overhead expenses. The minimum base price for growers will be adjusted based on a sliding scale, as identified in the section denoted "Sliding Scale" below, and paid as follows: 85% of Sliding Scale paid within 30 days of delivery to Graceland (i.e. 30 days of when pulled for processing) with quarterly true up payments on the balance based on Sliding Scale, paid 30 days following the end of each calendar or fiscal quarter.

**Sliding Scale:**    The portion of the minimum base price for the Cooperative's growers will be adjusted based on the Sliding Scale attached hereto as an exhibit. The Parties agree that they will renegotiate the Sliding Scale at least annually for the first two years after the date of the executed agreement, as the production yields improve beyond the levels achieved at the time this agreement was entered into, provided, if there are material cost, yield, or quantity changes, the Sliding Scale will be adjusted semi-annually in the first year. Thereafter, the Sliding Scale will be adjusted if there are material changes to cost, yields or quantities produced.

**Supply of Cranberries:**    The Cooperative will supply all of the raw cranberries that the processing facility in Warrens, Wisconsin utilizes under the operation of Graceland, to the extent the Cooperative is able to do so with cranberries of the needed variety and of acceptable quality, pursuant to an exclusive supply agreement between the Parties (the "Supply Agreement"). Graceland will not utilize cranberries from any other source except to the extent the Cooperative is unable to supply the quantities and varietals of acceptable quality required by Graceland for processing at the Facility. Graceland understands and agrees that the Supply Agreement will have "take or pay" minimum purchase requirements at agreed to quantities of raw cranberries, determined to meet the requirements of and terms and conditions of the

Cooperative's debt financing secured by the Property.

**Existing Finished Goods Inventory:**    Graceland will purchase all existing non-GMO inventory on the effective date of the Facility lease, at a purchase price of $1.12 per pound, which inventory shall be free and clear of all liens, encumbrances and security interests.

**Prepaid 2017 Crop Raw Cranberries:**    On or before October 31, 2017, Graceland will purchase 4,000,000 pounds of 2017 crop cranberries, at a purchase price of $0.25 per pound for a total purchase price of $1,000,000, which raw materials inventory shall be free and clear of all liens, encumbrances and security interests ("Prepaid 2017 Crop Cranberries"). The Cooperative agrees it will use the $1,000,000 in proceeds to make initial payments to its growers for their 2017 crop within ten days of receipt, based on and in proportion to their deliveries of 2017 crop cranberries to the Cooperative. Example: if the Cooperative's growers' 2017 crop is 25 million pounds, then the Cooperative will pay the growers an initial payment of $0.04 per pound. Graceland agrees that the Prepaid 2017 Crop Cranberries will be pulled uniformly on a monthly basis throughout the 2017 crop processing season based on a 12-month crop processing season, beginning on or around January 15, 2018, at a rate of the greater of: (i) ten percent (10%) of all cranberries used  by Graceland under the Supply Agreement for production in the respective month, or (ii) one twelfth of the 4,000,000 pounds of Prepaid 2017 Crop Cranberries, until Graceland's inventory of Prepaid 2017 Crop Cranberries is exhausted. Graceland also agrees that the storage charge per barrel (but not the $0.50 per barrel administrative charge) shall be paid by Graceland on the Prepaid 2017 Crop Cranberries, as pulled for processing.

**Board Member:**    The Cooperative will provide the name of one individual to be considered by the Nominating Committee for nomination to the Graceland board of directors. Graceland will use its reasonable efforts to have the Cooperative's nominee nominated to Graceland's board of directors for election by the Shareholders, with the first election to take place on or around May 2018.

**Cranberry Growers Cooperative Facility Use:**    The Cooperative will be able to maintain offices in a designated area of the Facility.  The designated area, allocated cost and payment terms will be mutually agreed upon between the Parties.

**Shared Services:**    The Parties will enter into a mutually agreed upon shared services agreement (the "Services agreement"), where Graceland will provide the Cooperative services for a designated amount to be mutually agreed upon.  The shared

services may include, but not be limited to, providing administrative and accounting services in support of the Cooperative's business including preparation of financial information and financial statements  for each crop pool;; and any other agreed upon services provided by Graceland as is mutually agreed upon and consistent with Graceland's lease and operation of the Facility and Equipment. Graceland will also toll process aronia delivered to the Facility by the Cooperative or its member, on a cost plus basis at an agreed upon rate.

**Equipment Lease Buyout Option:**        At the completion of the 10-year term of the Equipment lease, Graceland will have the option to purchase the Equipment and other   tangible personal property being leased under the Equipment lease for the sum of $10.  The Parties agree and understand that the Equipment lease constitutes a "bargain purchase" lease, and will be treated for tax and accounting purposes as a "financing lease" transaction.

**Facility Lease Extension Options:**        Under the Facility lease, Graceland will have the option to extend the Facility lease for a period of two five (5)-year extensions for the sum of $1,200 annually during each five (5)-year extension period.  Prior to the end of the second extension term of the Facility lease, the Parties will negotiate in good faith the terms and conditions of a new lease for the rental of the Facility, including a base rental rate based on the fair market value of the Facility, provided that neither Party shall be under any obligation to enter into a new lease for the Facility on terms that are not mutually acceptable and, if the Parties cannot agree on mutually acceptable terms, the Facility lease shall expire at the end of its term (including all extension terms).  If at any time during the term of the Facility lease there is a change in the lessor of the Facility, Graceland at its option exercisable upon 90 days' written notice to lessor may terminate the Facility lease and require lessor to pay for and reimburse Graceland for all reasonable costs and expenses incurred to remove and transport the Equipment from the Facility to a location in the Midwest United States designated by Graceland, and provided that such termination of the Facility lease shall not be an event of default under the Equipment lease.

**Refinancing Savings:**        If the Cooperative refinances the term first secured loans on the Property, the Parties agree that Graceland and the Cooperative will share in the savings per their prorate value in the Property per the appraisal, which shall be based on a percentage equal to a fraction, the numerator of which shall be the monthly rental rate on the Equipment lease and the

denominator of which shall be the total monthly amortized payments of the term first secured loans on the Property.

**Chapter 11:**

The Transaction and this term sheet is in contemplation that the Cooperative intends to reorganize under Chapter 11 of title 11 of the United States Code.  To the extent that agreements related to the Transaction are entered into after the filing of a Chapter 11 petition, the Parties shall consent to any approval that may be required under applicable law. Graceland will support and not object to the confirmation of a plan of reorganization filed by the Cooperative, provided such plan is consistent with this non-binding term sheet and/or the agreements entered into with respect thereto.

Nothing herein shall impact the binding provisions of the letter of intent already entered into by the Parties or completion of the due diligence contemplated in that letter of intent.

The Transaction and this Term Sheet remain subject to all approvals and authorizations by the Parties or under applicable law necessary for the Parties to enter into the agreements related to the Transaction

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

WHEREFORE, the Parties have caused this non-binding term sheet to be executed by their duly authorized officers hereto setting their hands as of the date first written above.

Cranberry Growers Cooperative                    Graceland Fruit, Inc.


By:_____      By:_____

Printed:_____      Printed:_____

Position:_____      Position:_____

Date:_____      Date:_____


12229491