UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

In re:                                                                  Case No.: 17-13318-11

CRANBERRY GROWERS COOPERATIVE,

               Debtor.

## MEMORANDUM DECISION

Debtor Cranberry Growers Cooperative ("CranGrow") filed a chapter 11 petition on September 25, 2017 ("Petition Date"). Maxwell Foods ("Maxwell") filed a Motion to Approve Recoupment or to Exercise Right of Setoff. CranGrow has moved for Summary Judgment on Maxwell's Motion.

### FACTS

On February 24, 2017, CranGrow and Maxwell Foods entered into an agreement for the sale of sweetened and dried cranberries ("Agreement"). Emails set out the terms of the Agreement.

CranGrow agreed to sell seven loads of cranberries to Maxwell at $1.15 per pound with special and defined payment terms as specified in the Agreement. ECF No. 225-1 at 3. It also agreed Maxwell would be the sole distributor of CranGrow's cranberries in Australia for 2017. *Id.* Exclusivity

would continue through 2018 provided Maxwell purchased at least seven loads of cranberries in 2017 and was current on payments.[1] ECF No. 225-1 at 3.

As noted, the Agreement included an "exclusive sales arrangement." ECF No. 225-1 at 3. The originator of the exclusivity term appears to have been Maxwell, which proposed:

> [W]e would like to also represent CranGrow in the Aust/NZ markets predominately held by Ocean Spray via Fruitmark on the basis of the success in first business and visit to your plant my [sic] Maxwell Foods.

*Id.* at 6.

CranGrow agreed to the exclusivity arrangement. CranGrow referred to the provision as an "exclusive sales agreement for the sale of sweetened dried cranberries into the Australian market." *Id.* at 2-3. It went on to "offer [Maxwell] an exclusive sales arrangement for the Australian market through the remainder of 2017." *Id.* at 3.

The Agreement contains no requirement that CranGrow sell to Maxwell or that Maxwell buy exclusively from CranGrow. Nor does the Agreement contain any terms or agreement for sales beyond the first seven loads.

---

[1] In total, the Agreement contained these terms:

| Agreement Terms | Ship date | Payment term |
|---|---|---|
| Load 1 | March 5 | 40% collection confirmation; 60% CAD |
| Load 2 | April 10 | 20% collection confirmation; 80% CAD |
| Load 3 | May 8 | 100% CAD |
| Load 4 | June 12 | 45 days from BOL date |
| Load 5 | End of 2017 | 60 days from BOL date |
| Load 6 | End of 2017 | 60 days from BOL date |
| Load 7 | End of 2017 | 90 days from BOL date |
| **Additional Terms**: Exclusivity in Australian market through 2017. Exclusivity through 2018 would continue if (1) Maxwell purchases seven full container loads in 2017 and (2) is current on payments. | | |

CranGrow shipped seven loads of cranberries in 2017 per the Agreement and related purchase orders. It is undisputed that Maxwell has not paid for the last three loads ("Loads 5-7"). Payment was not due for those loads on the Petition Date. The parties agree Maxwell owes CranGrow $128,475 for Loads 5-7.

On September 19, 2017, Paul Walsh and Chris Spratt (collectively, the "Maxwell Representatives") visited CranGrow's facilities. The Maxwell Representatives inspected CranGrow's inventory with Tim Feit, CranGrow's Director of Sales. CranGrow provided Maxwell with a summary of remaining product through the end of August. CranGrow said it "continue[d] to ship product, so some of these lots are no longer in inventory. If you want to make sure you get certain lots for your next order, please let me know the lots and volume you want and I'll give you a price quote." ECF No. 225-2 at 3. CranGrow updated the inventory summary a week later. ECF No. 225-3 at 2. Maxwell suggested it needed to conduct product tests before they could order and would "only offer circa 80 cents a pound...." *Id.* at 5. CranGrow responded that demand for its product continued and the price needed to stay at $1.05 per pound. *Id.*

Maxwell emailed CranGrow about Purchase Order 93 the same day.[2] Purchase Order 93 proposed 10 loads of April to June 2017 production at $1.05 per pound. Purchase Order 93 was also "subject to sample and

---

[2] There was also reference in the email to another possible order—Purchase Order 94. That is not the subject of Maxwell's claims for recoupment and is not addressed in this Decision.

specification approval." ECF No. 276-3, Exh. C at 4. There were no other payment terms stated. Nor were any lots identified. CranGrow replied it would need "more information on the drawdown, payment terms, and on how long evaluation/testing will take to be approved before [it] can accept the purchase orders." ECF No. 225-5 at 4.

CranGrow agreed to send samples of cranberries to Maxwell's Australia address. ECF No. 225-4 at 3. The agreed payment term was to be 60 days from BOL. ECF No. 225-5 at 2. CranGrow replied to Maxwell that it would be "selecting the lot numbers for your 10 load order and will email you the signed PO's . . . ." ECF No. 225-5 at 2. It also continued to sell product to other purchasers.

Maxwell sent a Purchase Order for Blanket Order 93 (Purchase Order 93). ECF No. 276-3, Exh. C at 4. It stipulated payment terms of 90 days from BOL at $1.05 per pound. Maxwell did not update Purchase Order 93 to reflect the agreed upon payment term of 60 days from BOL. There is no evidence CranGrow accepted this order or that any lots were identified for the order.

The parties dispute whether they finalized Purchase Order 93. Maxwell says the parties entered an agreement for the sale of 10 loads for $1.05 per pound. ECF No. 212 at 3. CranGrow maintains the parties never agreed on pricing or payment terms. ECF No. 225 at 2.

On November 15, 2017, CranGrow informed Maxwell it did not have enough cranberries to meet Purchase Order 93. ECF No. 276-2 at 42. Maxwell then purchased ten shipments of cranberries from Badger State Fruit

4

Processing for delivery through 2018. ECF No. 276-4 at 1. Maxwell asserts it paid $110,100 more under the agreement with Badger State than it would have under Purchase Order 93.

Maxwell contends the parties hold competing claims against one another that arose from the Agreement. The parties agree Maxwell owes CranGrow $128,475 for Loads 5-7. CranGrow disputes that it owes $110,100 for breach of Purchase Order 93. It argues if Maxwell has a claim for that amount, it is not part of the same transaction.

## DISCUSSION

### 1.   *Standard for Summary Judgment*

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (applied through Fed. R. Bankr. P. 7056). The Court must view all facts and indulge all inferences in the light most favorable to the nonmoving party and determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 242-43 (1986).

As a procedural matter, on summary judgment "the burden is on the moving party to establish that there is no genuine issue about any material fact, or that there is an absence of evidence to support the nonmoving party's case, and that the moving party is entitled to judgment as a matter of law." 20 Charles Alan Wright, Arthur R. Miller & Edward Cooper, *Federal Practice and Procedure* § 105 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).

5

The nonmoving party must present evidence to show there is a genuine issue for trial. The nonmoving party may oppose the motion by "any of the kinds of evidentiary materials listed in Rule 56(c), except for the mere pleadings themselves." *Id.* at 324. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (internal citations omitted).

    2.    *Standard for Contract Formation*

A contract does not need to be formal to be binding. At its heart, a contract is "a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." *Restatement (Second) of Contracts* § 1 (1981). In general, the formation of a contract requires three simple elements: bargained-for consideration and exchange, an offer, and acceptance. *C.G. Schmidt, Inc. v. Permasteelisa North Am.*, 825 F.3d 801, 805 (7th Cir. 2016). An offer is defined as the "manifestation of willingness to enter into a bargain." *Restatement (Second) of Contracts* § 24 (1981). And acceptance is a "manifestation of assent to the terms thereof." *Id.* at § 50.

To be enforceable, a contract requires (1) a manifest intent to be bound by the contract, (2) sufficiently definite terms, (3) consideration, and (4) that the contract and its performance not violate any laws. 1 *Williston on Contracts* (4th ed.), § 3:2. Both parties must assent to the "same thing in the same sense and at the same time," thereby reaching a meeting of the minds on the

contract's terms. 17 John Bourdeau, Paul M. Coltoff & William H. Danne, Jr., *Corpus Juris Secundum,* Contracts § 35.

The Agreement was a binding and enforceable contract. The parties bargained over the terms. CranGrow offered to sell seven loads of cranberries to Maxwell to be billed and delivered throughout 2017. CranGrow agreed to Maxwell's exclusivity in Australia in 2017. If certain conditions were met, exclusivity could continue in 2018. CranGrow's offer did not contemplate or specify terms for any additional loads of cranberries beyond the original seven. In turn, Maxwell manifested its intent to buy seven loads of cranberries under the specified terms. While the parties may have discussed the possibility of more loads, their "minds met" only on the seven original loads and the exclusivity provision.

    3.    <u>Recoupment</u>

        a.    *Defensive Right to Recoupment*

Though the Code does not define the term "recoupment," it has long been applied in the bankruptcy context. Recoupment is a defensive right through which a defendant may reduce the amount of a claim by showing it is not liable for all or part of that claim due to "events arising out of the same transaction." 5 *Collier on Bankruptcy* ¶ 553.10. *See also Reid v. Climatemp, Inc. (In re 3RC Mech. & Contr. Servs., LLC),* 505 B.R. 818, 827 (Bankr. N.D. Ill. 2014). If funds are subject to recoupment, then they are not considered part of the property of the debtor and thus not subject to the automatic stay. *New York State Elec. & Gas Corp. v. McMahon (In re McMahon),* 129 F.3d 93, 96 (2d Cir. 1997). A party

7

asserting a recoupment defense must show its claim arose from the same transaction that gave rise to the claim being asserted against it. *In re 3RC*, 505 B.R. at 827.

Maxwell asserts a recoupment defense against CranGrow under the theory CranGrow breached Purchase Order 93. CranGrow holds a claim against Maxwell for Loads 5-7. Maxwell insists its alleged claim under Purchase Order 93 can be recouped against CranGrow's claim for Loads 5-7 because they both arose out of the Agreement. The key question for this Court to determine is if there is a genuine dispute of fact on whether the parties' obligations arose from the same transaction.

        b.    *Were the Agreement and Purchase Order 93 one integrated transaction?*

Circuits are split on the appropriate test for determining whether two debts arose out of one transaction. Generally, courts have applied either the logical relationship test or the stricter single integrated transaction test. The Seventh Circuit has not expressly adopted either approach, but courts in the Circuit have generally applied the single integrated transaction test.[3] To be considered one "transaction" under that test, there must be "such a close, necessary relationship between" debtor's and creditor's claims "that the

---

[3] *St. Francis Physician Network v. Rush Prudential HMO (In re St. Francis Physician Network)*, 213 B.R. 710, 719 (Bankr. N.D. Ill. 1997); *In re Prochnow*, 474 B.R. 607, 616 (Bankr. C.D. Ill. 2011); *In re CDM Mgmt. Servs.*, 226 B.R. 195, 197 (Bankr. S.D. Ind. 1997); *Warsco v. Household Bank F.S.B.*, 272 B.R. 246, 253 (Bankr. N.D. Ind. 2002); *Barber v. Riverside Int'l Trucks, Inc. (In re Pearson Indus.)*, 142 B.R. 831, 849 (Bankr. C.D. Ill. 1992); *Raleigh v. Mid American Nat'l Bank (In re Stoecker)*, 131 B.R. 979, 980 (Bankr. N.D. Ill. 1991); *but see In re Health Mgmt. L.P.*, 336 B.R. 392, 393 (Bankr. C.D. Ill. 2005).

amount of the former cannot fairly be determined without accounting for the latter." *In re St. Francis Physician Network, Inc.*, 213 B.R. 710, 719 (Bankr. N.D. Ill. 1997). Under the single integrated transaction test, "both debts must arise out of a single integrated transaction so that it would be inequitable for the debtor to enjoy the benefits of that transaction without also meeting its obligations." *In re Univ. Med. Ctr.*, 973 F.2d 1065, 1081 (3d Cir. 1992).

Even so, the precise outlines of the single integrated transaction test are blurry and many courts have preferred "to focus on the particular facts of each case" rather than adopt a strict rule. 5 *Collier on Bankruptcy* ¶ 553.10[1]. Courts have generally found the "same transaction" requirement to be satisfied where the liabilities arose under a single contract. *Id*. But the mere fact that the obligations arose under a single contract need not mean recoupment is warranted. *See Conoco v. Styler (In re Peterson Distrib., Inc.)*, 82 F.3d 956, 960 (10th Cir. 1996) ("A 'same contract equals same transaction' rule would be overly simplistic. Instead, . . . the 'same transaction' analysis involves an examination of the parties' equities.").

It is clear the parties entered into the Agreement for the sale of dried sweetened cranberries. The parties also agreed that CranGrow would not sell cranberries to any other purchaser in Australia in 2017 or, potentially, 2018. The parties dispute they finalized Purchase Order 93, but for purposes of summary judgment, the Court will assume upon execution Purchase Order 93 was binding and enforceable.

Construing all reasonable inferences in Maxwell's favor, the Court grants summary judgment to CranGrow. The Agreement and Purchase Order 93 did not constitute a "single integrated transaction." The Agreement anticipated seven deliveries, all of which were made as agreed. It also bound CranGrow to refrain from selling dried sweetened cranberries in Australia to anyone other than Maxwell through 2018 *if* certain conditions were met. At the time of the petition, payment for Loads 5-7 was not due, Maxwell had not paid for them, and so the exclusivity was not yet enforceable for 2018.

Even if the exclusivity provision were enforceable for 2018 when Purchase Order 93 was signed, Maxwell would still fail to satisfy the single integrated transaction test. By its express terms, the exclusivity provision was negative, not positive. In other words, it restricted CranGrow from contracting with other Australian distributors—it did not obligate Maxwell to purchase anything beyond the original seven loads. It did not prevent Maxwell from buying cranberries from another supplier. It did not obligate CranGrow to sell cranberries to Maxwell.

Maxwell posits the Agreement established the relationship of the parties and thus any later purchase orders are necessarily part of the Agreement. But simply because the Agreement established a relationship does not mean it controlled all subsequent orders, especially where it contained no terms that applied to future orders.

Maxwell's argument could be construed as suggesting the Agreement was a requirements contract in which the parties agreed to buy and sell exclusively

10

with each other. If so, then conceivably the Agreement and Purchase Order 93 could constitute a single integrated transaction because the Agreement controlled all of Maxwell's future cranberry orders and obligated the parties to contract exclusively with each other. *See Zayre Corp. v. S.M. & R. Co., Inc.,* 882 F.2d 1145 (7th Cir. 1989).[4] But based on the language of the Agreement and Maxwell's own statements, that argument goes nowhere. Neither party anticipated the Agreement to be a requirements contract. Maxwell, who proposed the exclusivity provision, hoped to "represent CranGrow in the Aust/NZ markets." Maxwell's email continued, "we are very keen and would like to have your (CranGrow's) protection in our markets." In reply, CranGrow agreed to exclusivity and termed it an "exclusive *sales* agreement." (emphasis added).

The Agreement stipulated "that Maxwell would be the sole distributor of CranGrow's cranberries in Australia through the end of 2018." ECF No. 276 at 1. The language of the Agreement does not provide for any guaranteed sales or purchases. Instead, it simply sets terms for seven orders and some terms related to exclusivity of sales.

On its face, the Agreement defines the terms for the original seven loads and established an agreement that prohibited CranGrow from selling

---

[4] *See also Propane Indus., Inc. v. Gen. Motors Corp.*, 429 F. Supp. 214, 219 (W.D. Mo. 1977) ("An essential element of the valid requirements contract is the promise of the buyer to *purchase* exclusively from the seller. In the absence of such a promise, or some other form of consideration flowing from the buyer to the seller, the requisite mutuality and consideration for a requirements contract is absent.") (emphasis added).

11

cranberries to other Australian distributors for 2017 and possibly 2018. There is nothing in the Agreement that directly bears on Purchase Order 93: it did not establish price or payment terms, and it did not require Maxwell to buy any determined number of loads past the seven uncontested loads. This conclusion is also supported by the negotiations the parties conducted to arrive at Blanket Order 93, seven months after the Agreement. Purchase Order 93 was simply a later order for the purchase of cranberries that the parties negotiated anew, separate and unbound by the terms of the Agreement. Thus, Purchase Order 93 could not have formed a single integrated transaction with the Agreement.

Maxwell may still have a claim against CranGrow for breach of Purchase Order 93. But that claim does not stem from the Agreement and so is not eligible for recoupment against CranGrow's claim for Loads 5-7.

4. *Setoff*

The right of setoff allows "a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case." 11 U.S.C. § 553. For a creditor to exercise its state law right to setoff, it must show:

  (a) A debt exists from the creditor to the debtor and that debt arose prior to the commencement of the case;

  (b) The creditor has a claim against the debtor that arose prior to the commencement of the case; and

  (c) The debt and the claim are mutual obligations.

*United States v. Gerth*, 991 F.2d 1428, 1431 (8th Cir. 1993).

Setoff is much like recoupment, but it differs in subtle and important ways. Unlike recoupment, setoff is a "form of cross-action that depends in its application upon the existence of two separate, mutual obligations. Absent a right of setoff, each obligation would be independently enforceable." 5 *Collier on Bankruptcy* ¶ 553.10. The right of setoff does not require the obligations to arise out of a single transaction, but it does require they both arise prepetition. *Id.*

CranGrow's claim against Maxwell stems from the unpaid orders under the Agreement. Two of the three unpaid loads were shipped prepetition. While the third was shipped post-petition, it was ordered and reserved prepetition. On the other hand, Purchase Order 93 was placed post-petition.

For the reasons discussed above, Maxwell is not entitled to setoff of its claim. Purchase Order 93 is a stand-alone contract that did not relate back to the Agreement. Again, the parties executed Purchase Order 93 and its related purchase order two days after the Petition Date. As a result, if Maxwell has a claim for breach of Purchase Order 93, it arose post-petition and is not eligible for setoff.

## CONCLUSION

The Court grants CranGrow's Motion for Summary Judgment on Maxwell's assertion of the rights of recoupment and setoff.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

13

A separate order consistent with this decision will be entered.

Dated: June 27, 2018

> BY THE COURT:
>
> _____
> Hon. Catherine J. Furay
> U.S. Bankruptcy Judge