UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WISCONSIN

---

In re:    Case No.: 17-13318-11

CRANBERRY GROWERS COOPERATIVE,

Debtor.

---

## **MEMORANDUM DECISION**

Debtor Cranberry Growers Cooperative ("Debtor" or "CranGrow") filed for relief under Chapter 11. The United States Trustee ("UST") claims additional quarterly fees are due. CranGrow objects to the Administrative Claim of the Office of the United States Trustee. The UST opposes Debtor's Objection. The parties submitted an extensive stipulation of facts and agreed no evidentiary hearing was required.

## **FACTS**

CranGrow filed its Chapter 11 petition on September 25, 2017. Shortly thereafter, this Court approved CranGrow's proposed DIP financing with CoBank ("DIP Revolver Loan"). The DIP Revolver Loan consists of a roll-up and a revolver. The Revolver requires proceeds derived through the sale of CranGrow's cranberries be paid directly to CoBank to reduce the prepetition revolving credit line ("Direct Revolver Payments"). Prepetition debt is then rolled up into postpetition debt to the extent of each Direct Revolver Payment. CoBank then re-advances Direct Revolver Payments (less interest and fees) to CranGrow for normal operating expenses. At no point during this transaction

does the total amount of revolving indebtedness decrease during the period at issue.

Under 28 U.S.C. § 1930, the UST collects quarterly fees in Chapter 11 cases. Congress amended the fee schedule on October 26, 2017. The amount of the quarterly fee is based on the amount of a debtor's "disbursements" in a given quarter. Since CranGrow's "disbursements" exceed $1 million, the UST fee will be the lesser of 1% of disbursements or $250,000. The parties stipulate increased UST fees apply only to disbursements made on or after January 1, 2018. The term "disbursement" is not defined in the Code. At issue is whether the Direct Revolver Payments are "disbursements."

## DISCUSSION

Quarterly fees in Chapter 11 cases are calculated under a fee schedule. 28 U.S.C. § 1930(a)(6). The quarterly fee is based on the totaling of the debtor's "disbursements" in a given quarter. *Id.* The issue is the scope of the term "disbursements." It arises because the Code does not define the term "disbursement."

Nor does legislative history help. It merely suggests section 1930 "was to create a self-funding United States Trustee's Office." H.R. Rep. No. 764, 99th Cong., 2d Sess. 22, *reprinted in* 1986 *U.S.C.C.A.N.* 5227, 5234-35. An expansive definition of disbursement is, therefore, suggested to be appropriate. *In re Fabricators Supply Co.*, 292 B.R. 531, 535 (Bankr. D.N.J. 2003) ("Congress has amended § 1930(a)(6) six times to either increase the quarterly fees or to include other bankruptcy fees . . . ."). "The United States Trustee

2

System Fund was created by Congress to insure that the United States Trustee Program would be 'self-funded by the users of the bankruptcy system—at no cost to the taxpayer.'" *In re Cash Cow Servs. of Florida L.L.C.*, 249 B.R. 33, 36 (2000) (citation omitted). As a revenue generating mechanism, the UST fees are like a user tax. *In re N. Hess' Sons, Inc.*, 218 B.R. 354, 360 (Bankr. D. Md. 1998).

Most courts turn to the "plain meaning" of "disbursement" and define it expansively to include any transfer of funds of the estate—regardless of the method of transfer. This interpretation usually favors the UST's position. *See, e.g.*, *In re Huff*, 270 B.R. 649, 653 (Bankr. W.D. Va. 2001) ("disbursements" includes when a debtor pays out or expends money "even if the result seems harsh"); *Office of United States Tr. v. Hays Builders, Inc.*, 144 B.R. 778, 779–80 (W.D. Tenn. 1992) ("disbursements" covers all disbursements, whether made directly by debtor or a third party on behalf of debtor). *See also In re HSSI, Inc.*, 176 B.R. 809 (Bankr. N.D. Ill. 1995), *rev'd*, 193 B.R. 851 (N.D. Ill. 1996); *In re Meyer*, 187 B.R. 650, 653 (Bankr. W.D. Mo. 1995); *In re Ozark Beverage Co., Inc.*, 105 B.R. 510, 512 (Bankr. E.D. Mo. 1989). Courts also point to the *Black's Law Dictionary* definition of "disbursement"—the "act of paying out money, commonly from a fund or in settlement of a debt or account payable." *Disbursement, Black's Law Dictionary* (10th ed. 2014).

The UST points to cases with variations of the following definition used by courts: "all money . . . transferred by a debtor for any expense until a plan is confirmed or the case is converted or dismissed, whichever occurs first." *In re*

3

*Wernerstruck, Inc.*, 130 B.R. 86, 89 (D.S.D. 1991). Other courts have applied a simpler definition of "all payments from the bankruptcy estate." *St. Angelo v. Victoria Farms, Inc.*, 38 F.3d 1525, 1534 (9th Cir. 1994).

Most often, payments on revolving lines of credit are considered disbursements. The UST cites *In re Fabricators* to support this interpretation. There, the court interpreted "disbursements" broadly enough to include payments made to a postpetition lender on a revolving line of credit. *In re Fabricators*, 292 B.R. at 532. In *Fabricators*, the debtor entered into a postpetition loan. That loan was a revolving line of credit agreement involving only postpetition borrowing. *Id.* The debtor deposited all accounts receivable and other proceeds from collateral into an account maintained by the creditor. *Id.* At the end of each business day, the creditor "swept" money from the account, with the amounts swept credited as payment on the postpetition revolving line of credit. *Id.* at 533. Based on a lending formula, debtor could draw on the line. The debtor then paid operating expenses from its account. *Id.*

"[T]he revolving nature of the Line of Credit [was] precisely what result[ed] in the disbursement" because the debtor engaged in a series of borrowing transactions repaid by the sweeps of the blocked account. *Id.* at 534. The court rejected the debtor's argument that the repayment and re-advancement of funds from the line of credit was a continual flow of dollars against a line of credit so as to not constitute "disbursements." *Id.* This conclusion was appropriate where (1) any re-advance of money depended entirely on a formula that determined availability no matter the amount of

4

repayment and (2) the timing of any draws might vary from time to time. It is also conceivable in such a circumstance that the line could be paid and there may be periods with no further draws. The line in *Fabricators* was postpetition financing. There was no prepetition line. The funds actually settled obligations from the postpetition period of time.

The mechanism is different for CranGrow. While the form of the line appears on the surface to be like *Fabricators*, its substance is different. The deposit of funds into CranGrow's account was not governed by a formula that determined the amount of available credit. Rather, all of the collected accounts receivable minus fees and interest were deposited into Debtor's account. This flow of funds into Debtor's account was viewed by the parties as a cash management system. There was a continual flow of dollars against the prepetition debt converting it to immediately available funds as postpetition debt. While expenditure of the funds is limited by a budget, there was a symmetry between amounts credited against the prepetition line of credit balance and the amounts drawn on the postpetition line of credit.

In fact, the financing included an over-advance. This over-advance was important because, as shown by Debtor's Disclosure Statement, cash needs exceeded accounts receivable collections. Thus, postpetition draw deposits equaled or were greater than the accounts receivable credited against the prepetition revolver. The postpetition lending structure:

> is . . . really not much different than what would happen if we had cash collateral usage today. The debtor would . . . grant . . . a replacement lien [in] the postpetition assets . . . with the same dignity, priority, and effect as

> the prepetition lien. The new postpetition amounts . . .
> would get the benefits of whatever the Court feels is
> appropriate to grant . . . .

*Stip. of Agreed Facts*, ECF No. 384-1, Ex. A, p. 77.

The facts of *Fabricators* and CranGrow seem similar on the surface. Accounts are collected resulting in repayment or reduction of a line and then a re-advance against a revolving line of credit. There the similarity ends. CranGrow had the same lender prepetition and postpetition. The collection and application of accounts receivable functionally relabeled the prepetition indebtedness by "rolling up" that debt into postpetition debt.

Chapter 11 gives a debtor a procedure by which it can try to reorganize its financial affairs and satisfy its debts incurred before the bankruptcy under a plan of reorganization. The primary defining moment in a Chapter 11 bankruptcy proceeding is the filing of the bankruptcy petition, which effectively divides the debtor's world into two parts.

An integral theme under the Code is to preserve the status quo of the claims and assets comprising a debtor's bankruptcy estate while the debtor pursues restructuring initiatives and confirmation of a plan. The automatic stay, which arises upon the filing of the petition, operates to prohibit actions by a lender and other creditors from pursuing rights and remedies to enforce payment of their debts. At the same time, the Code prohibits a debtor from incurring any further debt out of the ordinary course of its business without bankruptcy court approval. This effectively ends any ongoing prepetition borrowing relationship. The cessation of prepetition indebtedness not only

operates to maintain the status quo by preventing any more encumbrance of the debtor's assets, but also serves to establish the prepetition claim of the lender.

Although the filing of a bankruptcy petition ends the prepetition revolving financing facility, the debtor may obtain postpetition financing upon certain conditions provided under the Bankruptcy Code and approved by a bankruptcy court. The postpetition financing and debt are technically new postpetition events, separate and distinct from the prepetition financing and corresponding debt.

Despite the basic bankruptcy principle of separating prepetition debt and collateral from postpetition debt and collateral, "roll-up" financing blurs that distinction and effectively converts the prepetition into postpetition debt. Under a roll-up, the prepetition revolving secured lender provides secured revolving postpetition financing.

But as opposed to segregating the prepetition collateral and applying it to prepetition debt and applying the postpetition collateral to the postpetition debt, *all* of the cash collateral generated by the debtor is applied first to reduce the prepetition debt. The postpetition revolving financing available to the debtor constitutes postpetition debt secured by postpetition collateral. The proceeds of prepetition collateral and a DIP loan are used to zero out or replace the prepetition debt, resulting in a postpetition debt equal to the prepetition debt plus any new money being lent to the debtor. Thus, as the pay down of prepetition debt progresses and the provision of postpetition revolving financing

increases during the debtor's bankruptcy, the lender effectively converts or "rolls up" its prepetition debt into postpetition debt. Generally, there is no substantive reduction of total debt until some point after all of the prepetition debt has been converted to postpetition debt.

From the lender's perspective, a roll-up of prepetition debt into postpetition debt has several advantages. One of the more significant benefits is that the obligations owed to the lender enjoy administrative priority if the collateral is less than the debt. This postpetition "administrative priority" claim results in preferable treatment of the lender under a plan of reorganization. Another advantage is an ability to control cash collateral because cash proceeds of collateral continue to be delivered to the lender. As a result, the entirety of the prepetition and postpetition debt enjoys the postpetition protection of sections 364(c) and/or (d). In a refinancing or a roll-up, the prepetition secured claim is paid through new debt or conversion to a postpetition claim rather than from unencumbered cash.

From the debtor's perspective, it can maintain its relationship with its prepetition lender. And it has the opportunity to have time to pursue strategies for reorganization and repayment of creditors.

The postpetition financing (and confirmed Plan) anticipate that, over time, the revolving loan principal balance will begin to decrease by reducing the

maximum amount of any over-advance.[1] That is not yet the case for the UST fees at issue.

Each case cited by the UST in support of its position involved settlement of debt or of accounts payable. *Fabricators* paid down a loan, and *Victoria Farms* had a mortgage paid from sale proceeds. *Cash Cow* and *Walton v. Jamko, Inc.*, 240 F.3d 1312 (11th Cir. 2001), paid operating expenses. In *Wernerstruck*, the debtor made prepayments on a bank debt settlement. Thus, each of those cases differed from CranGrow because there was settlement of debt, real reduction of debt, or payment of an account payable. By making Direct Revolver Payments, CranGrow merely changed the label of debt from prepetition to postpetition.

Further, the cases cited by the UST differ because the funds at issue here—as a matter of substance—never settle debt. The cases cited by the UST involve funds permanently leaving the estate, whether through payment of operating expenses, prepayment of a loan, satisfaction of a mortgage through selling land, or reduction of line of credit indebtedness for periods of time. Here, the funds at issue—cash collateral—were returned to CranGrow immediately. It paid interest and fees from those funds before the money was deposited in its account. To the extent there was no reduction in the total revolver indebtedness, there was no real change in the underlying economic

---

[1] The prepetition revolver had a principal balance of about $8.1 million. The DIP Financing provided for over-advances not to exceed $4 million. It was projected that by December 31, 2018, the principal balance would not exceed about $3.3 million. Actual reductions in the total amount owed CoBank would be disbursements under current definitions.

circumstances. CoBank merely received accounts receivable, subtracted fees and expenses, and returned the remainder to CranGrow. Analyzing the economic realities yields the conclusion these funds functionally belonged to CranGrow the entire time and were thus not "paid out" or "expended" in the traditional sense of "disbursement."

CranGrow has included payment of all operating expenses in its computation and payment of UST fees. This payment included UST fees on the interest and fees paid to CoBank. To the extent, if any, of principal balance payments on its term loan, CranGrow does not dispute those would be disbursements subject to UST fee computation. Nor has CranGrow raised an issue of whether the actual reductions in the Revolver that are projected would be subject to the UST fees if the case is still open.

"Undue hardship should not be placed on chapter 11 debtors" in analyzing section 1930(a)(6). *In re Smith & Son Septic & Sanitation Serv.*, 88 B.R. 375, 384 (Bankr. D. Utah 1988). The application of quarterly fees "must be accomplished in an equitable manner." *Id.* "Nothing in § 1930 mandates a double fee simply because of an efficient cash-management system." *In re HSSI, Inc.*, 176 B.R. at 814.

Neither should section 1930 mandate a double fee simply because the parties propose, and the court approves, postpetition borrowing that permits the debtor the use of its accounts receivable while protecting the prepetition secured creditor by "applying" those funds to convert the prepetition debt into postpetition debt.

*In re HSSI, Inc.* involved intercompany transfers among a Chapter 11 debtor parent company and debtor subsidiaries. Those transfers were not "disbursements." *Id.* at 813. The subsidiary debtors had a coordinated system under which subsidiaries deposited proceeds from some sales into a pooled account. *Id.* Pooled funds were used to make payments to a postpetition lender on an outstanding loan. *Id.* Payments from the pooled account to repay the loan were disbursements, but payments from the single accounts to the pooled account were *not* disbursements. *Id.* (emphasis added). Allowing the UST to calculate fees based off (1) payments from separate accounts to the pooled account and (2) payments from the pooled account to repay the loan constituted a "double fee." *Id. HSSI* was reversed, but on grounds of insufficient factual findings, and not on a rejection of the cash management system view.

CranGrow's DIP Revolver Loan contains elements of a cash management system and transfers like that in *HSSI*. First, the DIP Revolver Loan document refers to the setup as a "cash management arrangement," revealing the parties' intent. Second, funds are merely "recycled" through CoBank, who serves only as a conduit between revenue and expenses, since funds are immediately re-advanced and deposited into Debtor's account. The structure of the DIP Revolver Loan serves to give CoBank greater control and oversight and is not intended as a separate series of transactions. As CranGrow notes, this is "phantom cash intake."

None of the cases cited by the UST involve any form of centralized cash management system, representing another important distinction from

CranGrow. That said, *HSSI* and CranGrow could be distinguished on the ground the cash management system in *HSSI* involved two entities under common ownership, while CranGrow's system involves a debtor and creditor. The substance, however, of the flow of funds is the same. CranGrow has the use of its accounts receivable and additional funds while affording CoBank adequate protection. Effectively, this is, in part, simply the use of cash collateral with the fee and interest payments being adequate protection. It was structured differently to afford protections to CoBank and to enable CranGrow to have an over-advance.

Finally, because of the mechanics of the DIP Revolver Loan, counting certain Direct Revolver Payments as "disbursements" allows the UST to double dip. Given the seasonality of the farming business, CranGrow operates at break-even or a loss for much of the year. During these times, CranGrow is cash-poor. Its prepetition revolver exhausted, it needed the availability of over-advances from the DIP Revolver Loan. In fact, the Revolver draw/repayment is projected to be identical to the net negative cash flow until about the fourth quarter of 2018. The negative cash flow also includes the UST quarterly fee. Since it is cash flow negative and draws additional funds to pay UST fees, CranGrow incurs UST fees on fees if applying accounts receivable to the prepetition debt and then immediately converting it to a postpetition debt re-advance counts as two separate disbursements. This in effect represents a fee on a fee, or a form of double tax, resulting in an unfair cycle and snowball effect for much of the year.

For example, consider CranGrow's projections for the third quarter of 2018 ("Q3"). CranGrow projects it will operate at a total loss of $321,598. And CranGrow projects it will have zero cash on hand to pay UST fees for Q3. For every dollar of Q3 UST fees, CranGrow must withdraw more money from the DIP Revolver Loan. Eventually, CranGrow would repay each dollar through Direct Revolver Payments. If those Direct Revolver Payments are also counted as "disbursements," CranGrow incurs additional UST fees on Direct Revolver Payments it is making only because CranGrow had to draw on the DIP Revolver Loan to pay UST fees in the first place. Such an outcome results in double dipping.

The Code aims to provide debtors with a "fresh start." *Grogan v. Garner*, 498 U.S. 279, 286 (1991). "[A] central purpose of the Code is to provide a procedure by which . . . debtors can reorder their affairs, make peace with their creditors, and enjoy 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Id.* (citation omitted). A policy in Chapter 11 is also maximizing payment to creditors. *Bank of Am. Nat'l Tr. and Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999). Allowing the UST to collect multiple fees for what is in essence a single transaction places a greater burden on debtors and makes reorganization harder. *In re HSSI, Inc.*, 176 B.R. 809 at 815. It also takes funds away from creditors.

Including Direct Revolver Payments stemming from drawing on the Direct Revolver Loan to pay UST fees as "disbursements" undermines the goals

13

of Chapter 11 and has a "severe impact" on the ability of debtors, including CranGrow, to obtain a "fresh start" and effectively reorganize. Charging UST fees on conversion of prepetition debt to postpetition debt is also an undue burden. It improperly equates that transmutation with an actual "settlement of a debt." It is no such thing.

Under the Plan, unsecured creditors are set to receive less than eight percent payment on their claims. Treating Direct Revolver Payments like those here as "disbursements" could reduce or even eliminate the distributions to unsecured creditors. To illustrate, CranGrow proposes payment of $200,000 to unsecured creditors. The additional fees sought by the UST for the first quarter of 2018 is $42,601.17. Similar amounts will likely be due for the remaining quarters of 2018. If so, UST fees could amount to another $170,000 or more. Thus, amounts available for creditors could be less and administrative expenses higher. This potential effect on creditors is particularly troubling in a case in which all parties in interest (and with actual economic interests)—including unsecured creditors—were fully, actively, and ably represented throughout the case and after confirmation. It is also disturbing because the fee disproportionately impacts smaller to midsize debtors through its $250,000 cap.

Including Direct Revolver Payments as "disbursements" harms the viability of CranGrow moving forward and potentially the feasibility of a Plan. CranGrow's business revolves around farming, a seasonal business subject to immense volatility. Farmers are subject to external volatility out of their

control, such as tariffs. Effective May 4, 2018, the USDA implemented volume controls for cranberries in several states, including Wisconsin. 7 C.F.R. § 929, 14350-57. And the per-barrel price of cranberries is currently $29.20, down from a high of $55 in 2008. *Id.*; *see also Univ. of Wisconsin-Whitewater, Cranberries of Wisconsin: Analyzing the Economic Impact* 6 (2012), https://www.uww.edu/Documents/colleges/cobe/ferc/CranberryFinal.pdf. In sum, every dollar is important for CranGrow and its creditors and vendors.

Finally, imposing quarterly UST fees on Direct Revolver Payments does not further the underlying purposes of section 1930(a)(6)—to impose a tax on those who use the UST system so that system self-funds. CranGrow and its creditors are adequately represented, limiting the need for UST involvement. The fees the UST requests here are post-confirmation. Other than monthly reports, there is really no work for the UST in this case now. The requested UST fees bear no reasonable relationship or proportionality to the amount of work performed.

## CONCLUSION

The majority view holds all Direct Revolver Payments as "disbursements" under section 1930(a)(6). The great weight of case law broadly defines "disbursements" in a way that almost always benefits the UST. But it would be inequitable to apply UST fees to Direct Revolver Payments made only because of the need to draw on the Direct Revolver Loan to pay UST fees in the first place. Under this theory, a certain portion of Direct Revolver Payments are not "disbursements."

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

A separate order consistent with this decision will be entered.

Dated: September 21, 2018

BY THE COURT:

Hon. Catherine J. Furay
U.S. Bankruptcy Judge